1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    RICHARD L. ARNOLD,                        Case No. 13-cv-04456-EMC

8                     Plaintiff,

9           v.                                  ORDER GRANTING DEFENDANTS'
                                                MOTIONS FOR SUMMARY
10   BRAD SMITH, et al.,                        JUDGMENT

11                    Defendants.               Docket Nos. 57, 58

12

13                            I.    **INTRODUCTION**

14          This *pro se* prisoner's civil rights action is now before the Court for consideration of two

15   defense motions for summary judgment.  For the reasons discussed below, the motions will be

16   granted and judgment entered against Plaintiff.

17                            II.    **BACKGROUND**

18   A.     Procedural History

19          The amended complaint alleged that Defendants required Richard Arnold to clean and

20   work in an area containing lead paint and asbestos in May and early June 2012.  The amended

21   complaint also alleged that defendants Philip Earley and Gary Loredo "fail[ed] to disclose/enter

22   onto the Worker's Compensation forms exposure to Asbestos," and that failure "resulted in a

23   'fraudulent and/or Incomplete Worker's Compensation Claim.'"  Docket No. 12 at 4.

24          This action was one of six actions which asserted claims based on the alleged asbestos and

25   lead paint exposure during the cleaning of the mattress factory at San Quentin State Prison in May

26   and early June 2012. The six related actions were *Dewey Terry v. Smith*, C 13-4102 EMC; *Markee

27   Carter v. Smith*, No. C 13-4373 EMC; *Evert Spells v. Smith*, No. C 13-4102 EMC; *Norman

28   Hirscher v. Smith*, 14-340 EMC; *Richard Arnold v. Smith*, No. C 13-4456 EMC; and *Lynn Beyett

**United States District Court**
For the Northern District of California

*v. Smith*, No. C 14-3153 EMC.  The six prisoner-plaintiffs appeared to be coordinating their efforts, as their pleadings, requests, oppositions, and exhibits were similar.  On the other side, the Defendants were being represented by the Law Office of Nancy E. Hudgins, except for Jeremy Young, who was represented separately by attorney Kenneth Williams.  Defense motions for summary judgment were filed in five of the six cases, although not in this case, which was proceeding at a slower pace.

The Court chose one case (*Carter*), went through the evidence in that case, and issued an order granting in part and denying in part Defendants' motion for summary judgment.  The Court then sent to the parties in all six cases the lengthy order in the *Carter* case, explaining that the ruling in *Carter* was not technically dispositive of the motions for summary judgments in each of the other related cases, but that the ruling showed the Court's evaluation of the evidence and provided enough guidance for the parties in all the cases to have a good sense of their relative positions for settlement purposes.  The Court then referred all the cases to a magistrate judge for settlement proceedings.  Four of the actions settled, leaving this action and *Terry v. Smith*, No. 13-cv-1227 EMC, remaining for adjudication.[1]

B.    Statement of Facts

The following facts are undisputed unless otherwise noted.

The events and omissions giving rise to this action occurred in May and early June 2012 ("the relevant time").  Mr. Arnold presents evidence that the cleaning work began on May 9, although no evidence that the power washer was in use before May 23.  Docket No. 12 at 3.  The parties agree that the work stopped on June 6.  *Id.*; Docket No. 1-1 at 2 (worker's compensation form signed by G. Loredo and P. Earley states: "From 5/29/2012 to 6/6/2012, inmate Arnold was

---

[1] There are some differences in the evidence between Mr. Arnold's case and Mr. Terry's case, which slightly alter some of the analysis but do not change the conclusion on the motions for summary judgment.  The differences are: (1) only Mr. Arnold presents evidence that the pipe coverings in the mattress factory were painted with the word "asbestos" on them; (2) Mr. Arnold presents no evidence that he filed a claim with the Victim Compensation and Government Claims Board; (3) Mr. Arnold does not present a copy of the decision on his worker's compensation claim; (4) Arnold does not include a copy of the N95 mask brochure; (5) Arnold does not present a full copy of the asbestos abatement report; and (6) Dr. Piatt's declaration discusses Mr. Terry's medical file, but not Mr. Arnold's medical file.  None of these differences are material, and thus they do not mandate different results in the two cases.

*United States District Court*
For the Northern District of California

scraping, sanding, and powerwashing potential lead based paint off the walls and windows of the mattress factory").

At the relevant time, Mr. Arnold was a prisoner at San Quentin State Prison and worked in the California Prison Industries Authority ("CALPIA") mattress and bedding factory at San Quentin (the "mattress factory"). Mr. Arnold was approximately 64 years old at the relevant time. (Docket No. 58-2 at 29.) Defendants worked for CALPIA. Joe Dobie was the temporary supervisor of the mattress factory. Philip Earley was initially the factory manager of the mattress factory, and then was assigned temporarily to Folsom State Prison. Gary Loredo was the superintendent for several CALPIA factories, and also was the acting factory manager of the mattress factory while Mr. Earley was at Folsom. Jeremiah Young was a supervisor at the mattress factory, but was reassigned to work in a different location during the relevant time.

        1.     <u>The Cleaning of the Mattress Factory</u>

In May to June each year, CALPIA factories throughout California cease production as they prepare to take annual inventory at the end of the fiscal year. When the factories cease production, inmate-workers clean the work areas. Cleaning operations in the mattress factory include removing the cotton dust from the walls, stripping the floor, and repainting the floor and lines on the floor of the factory. Every couple of years, the cleaning process also entails repainting the factory walls, which requires removing the dust from the walls to be painted. *See* Docket No. 63 at 57. Approximately 40 or 50 inmates were on the crew that cleaned the mattress factory in 2012. *See* Docket No. 1-1 at 7; Docket No. 12 at 26.

In May 2012, Mr. Griffin, the superintendent of the mattress factory, informed Mr. Earley that he intended to have the factory walls painted. Mr. Earley approved the decision. Mr. Griffin ordered paint and coordinated with Jeremy Young to have the walls painted in conjunction with the cleaning of the mattress factory. Mr. Dobie assisted with the cleaning and painting preparations. Docket No. 63 at 57-58.

On May 23, Mr. Earley appointed Mr. Dobie to oversee the mattress factory through inventory. Docket No. 12 at 41.

On May 23 or 24, Mr. Dobie held a meeting with the inmates, and explained that they

**United States District Court**
For the Northern District of California

would be cleaning and painting the mattress factory for the next two weeks.  *See* Docket No. 12 at 6.  (Defendants present evidence that the event occurred on May 29.  Docket No. 58-2 at 16.)  Mr. Dobie explained that the plan was to remove the paint from the bottom section of windows and areas on the walls where paint was peeling and blistering, and that portions of the floor would be repainted.  He told the inmates to check out putty knives, scrapers and wire brushes from the tool room to remove paint from the windows and walls. Inmates also used a compressed air hose to remove cotton dust that had collected on the walls and surfaces around the mattress factory to prepare for painting.  Docket No. 58-2 at 17.

The parties disagree about the use of the power washer.  Mr. Arnold presents evidence that inmates using the power washer disturbed wrapping that was on the ceiling pipes.  Mr. Arnold states that the wrapping contained asbestos.  According to Mr. Arnold, when the inmates washed the ceiling and pipes, the pipe "insulation broke free upon contact with the hot water washer disbursing both wet and dry particles throughout" the factory onto the inmates, including Mr. Arnold.  Docket No. 63 at 2.  The water from the power washer and the floor-stripping solvents combined in "large pools on the floor," and mixed with the paint chips.  *Id.*  Inmates "waded through" and "inhaled" the materials "for approximately ten days."  *Id.*

Mr. Arnold's evidence indicates the power washing started no earlier than May 23.  *See* Docket No. 12 at 24-28 (group inmate appeal signed by Arnold and others states that Dobie was first assigned to supervise on May 22, and that the inmates' exposure to hazardous materials started on May 24); Docket No. 12 at 8 (Arnold's complaint alleges that Dobie acquired the power washer on or about May 25).  Using May 23 as the starting date, and taking into account that May 28 was the Memorial Day holiday and Mr. Arnold's statement that the inmates had a Monday-Thursday work week, the power washing went on for eight days:  May 23 (Wednesday), May 24 (Thursday), May 29 (Tuesday), May 30 (Wednesday), May 31 (Thursday), June 4 (Monday), June 5 (Tuesday), and the morning of June 6 (Wednesday).  *See* Docket No. 58-2 at 32 (four-day work week).

Defendants present evidence that the power washer was in use only for a couple of days, at the most.  In a memo dated June 7, Jeremy Young (whose job title was "industrial supervisor,

United States District Court
For the Northern District of California

mattress & bedding"), wrote that, on June 4, he received instructions from his "immediate superior, Joe Dobie" to "pressure wash from ceiling to floor" and to cover the electrical boxes and junctions so that no water would interfere with the electrical wires or connections.  Docket No. 57-2 at 4.  Mr. Young further stated in the memo that he "frequently checked in with [his] superior" – apparently referring to Joe Dobie – "to make sure we were proceeding according to his plans.  Joe Dobie stated multiple times throughout the day that I had to make sure that Inmates have N95 dus[t] mask[s] on.  He emphatically stated, in regards to the rationale for the dust masks; 'There could be lead in the paint that they are scraping off of the walls and windows.'"  *Id.*  According to Mr. Young's memo, Mr. Dobie told him before the end of the day (on June 4) to continue with the same procedures the next day, i.e., scrape the paint off the walls and windows.  *Id.*  That same memorandum noted that, on June 5, the inmates' "workload consisted of scraping, sanding, and pressure washing walls and floor."  *Id.*  Mr. Young's memo did not mention asbestos.  *See id.* at 4-5.

On the morning of June 6, Luu Rogers, who worked in the CALPIA maintenance division, walked through the mattress factory and observed that paint had been removed from the factory walls and windows, and that the ceiling had been pressure-washed, including the asbestos wrapping on the overhead steam pipes.  Docket No. 63 at 18.  Mr. Rogers contacted Mr. Loredo and advised him of the potential lead and asbestos hazard in the building.  Cleaning and painting operations were immediately halted on the morning of June 6.  *Id.* at 18-22 (Rogers' June 6 and June 7 memos).

Photos of the factory show an open and airy workspace with a ceiling at least 12 feet high, and a limited number of pipes running near to the ceiling.  The pipes are covered with what appears to be insulation wrapped with tape, although there is no visible writing on the pipe covering.  The portions of the pipe covering that are disturbed are quite limited in number and the disturbed areas are quite confined in size.  For example, no disturbed area appears to be bigger than about six inches long.  *See* Docket No. 50 at 17-30; Docket No. 50-1; Docket No. 50-2;

United States District Court
For the Northern District of California

1  Docket No. 50-3.[2]  The disturbances on any particular pipe appear few and far apart.

2      2.        <u>Post-Shutdown Testing And Remediation At The Mattress Factory</u>

3          CALPIA commissioned Earthshine Consulting, Inc., an environmental hazard company, to

4  test for lead and asbestos.  On June 8, 2012, Earthshine collected samples from floor debris in four

5  locations in the factory to conduct a preliminary test for the presence of lead and asbestos.  No

6  asbestos was detected in those samples.  Docket No. 58-2 at 12; Docket No. 63 at 47-51.

7          On June 27 or 29, 2012, Earthshine took additional samples from around the mattress

8  factory.  Docket No. 58-2 at 12.  Those samples showed asbestos in the mastic adhesive under the

9  floor tiles in the factory supervisors' office and trace amounts of asbestos in the glazing putty

10  around the office windows, but it is undisputed that no inmates scraped paint in the office.  Both

11  materials were noted to be in "good" condition.  *See id.*  Earthshine noted that the steam pipes

12  along the factory ceiling were not tested but that the pipe wrapping was assumed to contain

13  asbestos and was in "good" condition.  *Id.* at 12-13.  The report did not mention whether the pipe

14  wrapping had been damaged by the pressure washer as claimed by Mr. Arnold.  According to

15  Defendants, the lead-detection samples taken showed that only the outside of the swing-out

16  windows of the factory had elevated lead levels.  *See* Docket No. 58-2 at 12.  That, however, does

17  not mean that there had not been lead paint elsewhere, as the workers had been scraping the paint

18  for many days before the testing was done and the lead test results from the June 8 sampling of

19  floor debris are not in the record.

20          The mattress factory was cleaned by Performance Abatement Services beginning on

21  July 5, 2012.  Following the cleaning and remediation, Performance Abatement Services

22  confirmed that the factory passed standards for lead presence.  The mattress factory resumed

23  operations in Fall 2012.  *See* Docket No. 12 at 44-47; Docket No. 63 at 59.

24      3.        <u>Defendants' Awareness Of The Risks</u>

25          Mr. Arnold presents evidence that prison officials generally were on notice of the presence

26

27  [2] According to Mr. Arnold, the photos were taken during a site visit on November 2, 2015, Docket No. 50 at 16. Two photos have humans in them, which enables the viewer to have a sense of the size of the factory and damage to the pipes.  *See* Docket No. 50 at 19; *see also* Docket No. 50-3 at 8.

28

United States District Court
For the Northern District of California

of asbestos in the prison.  He presents a CALPIA "worksite orientation" pamphlet for "new employee/CDCR staff/outside personnel" that had general workplace information, including this caution about asbestos: "Asbestos covered pipes are located throughout the PIA complex.  DO NOT DISTURB these pipes.  If you see a problem, notify a supervisor."  Docket No. 61 at 30-31.  The pamphlet is undated, but there are markings indicating that it was in use in 2006, *id.* at 30, long before the relevant time in this action.  Mr. Arnold also presents a copy of a "San Quentin Warden's Bulletin" regarding the "annual asbestos notification" that was directed to "all staff" and suggested there was asbestos-containing material somewhere in the prison; however, the bulletin is dated January 14, 2013, after the relevant time period.  Docket No. 1-2 at 18.

The parties disagree whether Mr. Dobie and Mr. Young knew of the presence of lead and asbestos in the mattress factory at the relevant time.  Mr. Arnold presents a declaration made under penalty of perjury from inmate Lynn Beyett, that he (Mr. Beyett) alerted Mr. Dobie to the presence of lead paint and asbestos on May 23 or May 24:

> I went up to Joe Dobie and I said, "You do know all the paint on the windows and walls are "Lead Paint, and the pipes are wrapped in "Asbestos."??  He told me not to worry about it, he is running this shop & Lead Paint and Asbestos would not hurt anyone.  I said, "Mr. Dobie, I've been in the building trade for over Thirty (30) years, and we can't just scrap & chip or sand "Lead Paint", or power wash those pipes, as it will burst the Asbestos loose."

> I said, "There is Federal Laws that mandate we be trained and wear protective suits and have a breather at the very least.  Joe Dobie, then told me, "It's none of my business, I am the boss."  I then walked over to the maintenance shop to talk it over with our regular supervisor Mr. J. Young.  I told Mr. Young of the whole conversation I had with Joe Dobie, at which time Mr. Young said, "I know about it because I told Joe Dobie it's illegal and very wrong to make inmates work with no training on lead paint & asbestos removal, and no protective gear & Breather respirators.  I said, "Well what do we do?"  Mr. Young said, "Document everything or don't do it."  I said, He (Joe Dobie) told every one to either do what he says, or go home & refuse.  I can find replacements."  Mr. Young said, You have to do what Dobie says, or you will be fired most likely.  You know whatever Dobie says, it's the same as coming from the plant manager Phil Earley." . . .  Phil Earley had already told everyone, "You do what Dobie tells you to do.  It's the same as me telling you, because I have 600 men who want a job over in west block.  I will replace everyone of you if I have too."

Docket No. 12 at 6-7.

7

1  The parties dispute whether the pipes were marked as containing asbestos.  Mr. Arnold

2  testified in his deposition that some of the pipes had the word "Asbestos" painted on the pipes in

3  red lettering.  Docket No. 58-2 at 34.  And he presents a picture, which he suggests is of a pipe in

4  the mattress factory, on which the words "ASBESTOS Avoid Creating Dust" is printed in large

5  red letters.  Docket No. 60 at 41.[3]

6  There is no evidence that Mr. Earley or Mr. Loredo knew that Mr. Dobie planned for the

7  inmates to use a power washer to clean the mattress factory, or that the inmates would use a power

8  washer or otherwise disturb the pipe coverings.

9      4.    <u>The Testing Of Inmates And Preparation Of Workers' Compensation Forms</u>

10  After factory operations were halted on June 6, the inmates were tested for lead exposure.

11  Mr. Arnold's blood was tested on June 8, and the test came back with normal results.  Docket No.

12  1-1 at 6; Docket No. 58-2 at 35.

13  No test to measure asbestos exposure was done on Mr. Arnold, and there is no evidence

14  that such a test exists for recent exposure to asbestos.  *See* Docket No. 1-3 at 4 (September 13,

15  2012 memorandum to Mr. Arnold from the California Correctional Health Care Services

16  department denying his request for a test for asbestos exposure; "[u]nfortunately, there is no

17  'testing' available for asbestos exposure in your circumstance.  In general, if there are any effects

18

19  [3] Mr. Arnold's evidence that the pipe-coverings were marked with the word "asbestos" in red paint
20  is different from the evidence offered by the plaintiffs in the other related cases.  Interestingly, the
    page he submits showing the photo of the marked pipes appears also has another photo of labeled
21  "upholstery floor," which would be more consistent with a workspace found in a furniture factory
    than a mattress factory.  Docket No. 60 at 41.

22  Mr. Earley and Mr. Loredo dispute that they actually knew of asbestos or lead paint in the
    mattress factory.  Mr. Earley states:  "I was generally aware that some of San Quentin's facilities
23  contained lead paint or asbestos, but I never received training concerning identification of those
    materials nor where they were located."  Docket No. 58-2 at 12.  Mr. Loredo states that he was
24  "aware that some of the steam pipes running along the walls and ceilings of the furniture factory
    were wrapped in asbestos material because the pipes were marked 'Asbestos.'  But, I had no
25  information concerning the presence of asbestos or lead paint in the mattress factory."  Docket No.
    58-2 at 22-23.  Mr. Loredo also generally was aware that San Quentin executive staff issued
26  notices regarding asbestos at the prison, but he never received specific information concerning its
    presence in the mattress factory.  *See id*. at 23.
27

28  As it is the summary judgment stage, the court assumes true Mr. Arnold's evidence that the
    pipes in the mattress factory were labeled with the word "asbestos."

United States District Court
For the Northern District of California

1   arising from asbestos exposure they are very slow to develop and may take decades to manifest to

2   a degree to permit a test and diagnosis of the condition.")

3        A worker's compensation fund claim was submitted for Mr. Arnold.  *See* Docket No. 1-1

4   at 1-3.  On the portion of the form where the claimant is to state the "specific injury/illness and

5   medical diagnosis if available," prison officials typed in "possible exposure to lead."  *Id.* at 1.  The

6   form was signed by Mr. Loredo as the employer representative.  *Id.* at 2.  Mr. Arnold states that he

7   did not fill out the form, although he does not dispute that he signed it.  Docket No. 58-2 at 41.

8   Mr. Arnold does not present evidence whether his claim was rejected or accepted by the State

9   Compensation Insurance Fund.  There is no evidence that Mr. Arnold took any further steps with

10  regard to a worker's compensation claim.

11       There is no evidence that Mr. Arnold filed a claim with the California Victim

12  Compensation and Government Claims Board.  In his deposition, he admitted he did not know

13  whether he ever filed such a claim.  Docket No. 58-2 at 40.  The claim rejection letter he submitted

14  as an exhibit was for another inmate.  *See* Docket No. 50 at 15.

15       5.    <u>Medical Information</u>

16       Mr. Arnold attributes eye problems, breathing problems, chest pains and headaches to his

17  exposure to asbestos.  Docket No. 12 at 4.  Mr. Arnold has no medical training and offers no

18  competent evidence to prove a causal connection between any of his current health issues and

19  exposure to lead paint or asbestos.

20       Defendants present a declaration from a medical expert, Brad Piatt, M.D., who obtained his

21  A.B. in biochemistry and completed post-graduate work in biochemistry at U.C. Berkeley,

22  obtained his medical degree at Vanderbilt University, and now is a board-certified radiologist.

23  Docket No. 58-2 at 3.  Dr. Piatt has "obtained substantial experience with asbestos and asbestos

24  related medical illnesses during the analysis of diagnostic imaging for over a thousand patients

25  being evaluated for asbestos exposure in order to determine the presence, type and extent of

26  disease."  *Id.*  Dr. Piatt opines "to a reasonable medical certainty" that the inmates who did the

27

28

9

1    clean-up in the mattress factory have "not and will not sustain any injury as a result." *Id.* at 5[4]

2    With regard to the claimed lead exposure, Dr. Piatt declares that, "[i]n adults, lead inhalation

3    rarely results in medical disease unless there is prolonged exposure to high concentrations." *Id.* at

4    8.

5            According to several government authorities, "medical science has not established any

6    minimum level of exposure to asbestos fibers which is considered to be safe to individuals

7    exposed to the fibers." 20 U.S.C. § 3601(a)(3) (Congressional statement of findings and purposes

8    for the Asbestos School Hazard Detection and Control Act of 1980); *id.* at § 4011(a)(3)

9    (Congressional statement of findings and purpose for the Asbestos School Hazard Abatement Act

10    of 1984); "Asbestos NESHAP Adequately Wet Guidance," Office of Air Quality Planning and

11    Standards, U.S. Environmental Protection Agency, EPA340/1-90-019 (1990) at 1 ("no safe

12    concentration of airborne asbestos has ever been established").  "[E]xposure to asbestos fibers has

13    been identified over a long period of time and by reputable medical and scientific evidence as

14    significantly increasing the incidence of cancer and other severe or fatal diseases, such as

15    asbestosis." 20 U.S.C. § 3601(a)(1) (Congressional statement of findings and purposes for the

16    Asbestos School Hazard Detection and Control Act of 1980).  Although making these findings

17    about the general hazard of asbestos, Congress did not choose to close all potentially affected

18    schools and instead directed that a task force be established, that States prepare plans, and that

19    financial and other assistance be provided to States to address the problem.  *See* 20 U.S.C.

20    § 3601(b).

21            The Occupational Safety And Health Administration ("OSHA") has regulations that do

22    allow some asbestos exposure for workers.  One regulation sets a "permissible exposure limit" for

23    employee exposure to asbestos.  *See* 29 C.F.R. § 1910.1001(c)(1) ("The employer shall ensure that

24    no employee is exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic

25    centimeter of air as an eight (8)-hour time-weighted average"); *id.* at § 1910.1001(c)(2) ("The

26

27    ──────────────
      [4] Dr. Piatt's declaration was prepared specifically for the *Terry* case, and was recycled for use in
28    Mr. Arnold's case.  Dr. Piatt did not evaluate Mr. Arnold's medical records.  Nonetheless, his
      observations and conclusion apply with equal force in both cases.

**United States District Court**
For the Northern District of California

employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes").

### III.   VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at San Quentin State Prison in Marin County, which is located within the Northern District.  See 28 U.S.C. §§ 84, 1391(b).  The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.  *See* 28 U.S.C. § 1331.

### IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendant's challenge to the Eighth Amendment claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex*, 477 U.S. at 324.

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial.  *See Houghton v. South*, 965 F.2d

1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine dispute of fact on each issue material to his affirmative defense.  *Id*. at 1537; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine dispute of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  Mr. Arnold's amended complaint (i.e., Docket No. 12) is made under penalty of perjury and is considered in opposition to the motion for summary judgment.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact.  *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  *See id*. at 631.

## V.    DISCUSSION

### A.    Eighth Amendment Claim

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Deliberate indifference to an inmate's health or safety may violate the Eighth Amendment's proscription against cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety.  *See Farmer*, 511 U.S. at 834.

**United States District Court**
For the Northern District of California

1.    <u>Asbestos</u>

        a.    <u>Objective Prong</u>

Exposure to toxic substances may be a sufficiently serious condition to establish the first prong of an Eighth Amendment claim, depending on the circumstances of such exposure, as explained by the Supreme Court in *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (inmate stated Eighth Amendment claim based upon possible future harm to health, as well as present harm, arising out of exposure to second-hand smoke).  The plaintiff "must show that he himself is being exposed to unreasonably high levels" of the toxic substance.  *Helling*, 509 U.S. at 35.  Moreover, determining whether the condition violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxic substance].  It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate."  *Helling*, 509 U.S. at 36.

Although *Helling* was a second-hand smoke case, the rule also applies to asbestos exposure.  In *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit cited *Helling* in a case in which an inmate had been exposed to asbestos during a prison cleaning operation.  The facts were much stronger for the plaintiff in *Wallis* than in Mr. Arnold's case, as the *Wallis* plaintiff extensively handled asbestos-containing materials when he was on a work detail required to clean an attic with damaged asbestos-containing insulation on pipes and insulation material that "had broken loose and lay scattered around the attic" with other debris.  *Id.* at 1075.  Wearing inadequate masks, the inmates were required to "tear off loose pipe covering and insulation" and bag it for disposal in a dusty attic without outside ventilation.  *Id.*  The court in *Wallis* spent little time discussing whether the objective prong was satisfied for the Eighth Amendment claim because it was "uncontroverted that asbestos poses a serious risk to human health," and the plaintiff's medical expert had declared that the amount of exposure for that plaintiff was "medically serious," *id.* at 1076.

**United States District Court**
For the Northern District of California

1    Other circuits also have cited *Helling* in cases involving toxic substances such as asbestos.

2    *See, e.g., Templeton v. Anderson*, 607 F. App'x 784, 787 (10th Cir. 2015) (summary judgment

3    proper for defendant because requiring inmate to work for one hour removing asbestos mastic and

4    tiles "was not a significant duration given the type of exposure at issue" and therefore did not

5    satisfy the objective prong of Eighth Amendment claim); *Smith v. Howell*, 570 F. App'x 762, 765

6    (10th Cir. 2014) (affirming summary judgment on qualified immunity grounds on Eighth

7    Amendment claim because there were no Tenth Circuit or Supreme Court cases by 2003 that had

8    held "that a limited exposure to asbestos dust for a few hours poses such an objectively serious

9    risk of future harm to offend contemporary standards of decency.  Indeed there is no such

10   authority even today."); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (there would be

11   genuine issues of fact whether plaintiff was exposed to levels of asbestos sufficient to pose an

12   unreasonable risk of damage to his future health based on his two-month stay in a facility

13   "contaminated with asbestos to which inmates were routinely exposed," but summary judgment

14   was proper because he alleged no physical injury and, pursuant to 42 U.S.C. § 1997e(e), he could

15   not recover damages for mental and emotional stress without physical injury); *McNeil v. Lane*, 16

16   F.3d 123, 125 (7th Cir. 1993) (Eighth Amendment claim properly dismissed because being housed

17   in a cell for ten months near asbestos-covered pipes was not a serious enough condition; plaintiff

18   "does not allege facts sufficient to establish that he was exposed to unreasonably high levels of

19   asbestos.  Had, for example, [plaintiff] been forced to stay in a dormitory where friable asbestos

20   filled the air, . . .we might agree that he states a claim under the Eighth Amendment. . . .  That,

21   however, is not this case. . . . [T]he fact remains that asbestos abounds in many public buildings.

22   Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under

23   contemporary standards, be considered cruel and unusual.")

24   Mr. Arnold fails to show a triable issue on the objective prong of his Eighth Amendment

25   claim.  On the evidence in the record, no reasonable jury could find that Mr. Arnold was "exposed

26   to unreasonably high levels" of a toxic substance.  *Helling*, 509 U.S. at 35.  Mr. Arnold's only

27   evidence is that there was some unspecified amount of asbestos in the mattress factory and that a

28   power washer in use for at most eight work days disturbed pipe covering presumed to contain

asbestos.  As noted above, the disturbances to the pipe covering appear to be minimal.  And the samples from floor debris taken shortly after the shutdown contained no asbestos.  The only asbestos found was non-friable.  In contrast to *Wallis*, Mr. Arnold fails to establish any evidence that he was exposed to unreasonably high levels of a toxic substance.  Indeed, Mr. Arnold admitted in his deposition that he does not know if he was exposed to any particular quantity of asbestos.  That the air in the factory was dusty provides little information about the quantity of asbestos released because cotton dust was present before any disruption of the pipe covering:  the surfaces in the mattress factory had a cotton dust build-up that the workers were cleaning to get ready for painting.  There is no evidence the dust contained any asbestos, much less a dangerous amount of asbestos.

Mr. Arnold appears at best to rely on a presumption that *any* exposure to asbestos is so grave that it violates the Eighth Amendment, but that sort of generalized presumption does not satisfy the standard set out in *Helling*.  Mr. Arnold fails to present evidence that would allow the Court or a jury to do "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure" to asbestos, as contemplated by *Helling*, 509 U.S. at 36.  Without such evidence, neither the Court nor any reasonable jury could determine that the risk that Mr. Arnold complains of is "so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk."  *Id.* Although there are Congressional findings that "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe," 20 U.S.C. § 3601(a)(3), those findings did not result in Congress deeming it necessary to shut down all schools because of the possibility of asbestos; instead, Congress provided time for studying, planning and funding efforts for asbestos remediation in schools.  Similarly, an OSHA regulation identified by Defendants permits some small asbestos exposure, rather than forbids any and all exposure of workers to asbestos.  *See* 29 C.F.R. § 1910.1001(c).  The evidentiary void as to the science and statistics in Mr. Arnold's case is fatal to his case.

In addition to failing to show exposure to any measurable level of asbestos, Mr. Arnold also fails to establish a genuine issue for trial that he has suffered any current injury or has a

United States District Court
For the Northern District of California

likelihood of future injury as a result of his participation in the mattress factory clean-up.  No

medical expert declared that the amount of asbestos exposure for Mr. Arnold (if any) was

"medically serious," unlike in *Wallis*, 70 F.3d at 1076.  Mr. Arnold's assertion to the contrary

cannot sustain his claim; he has no medical training, and offers nothing but speculation that his

current ailments are causally related to the toxic substance exposure.  He also fails to show any

probability of future harm from the asbestos exposure.  In contrast to the dearth of evidence from

Mr. Arnold, Defendants present an undisputed medical expert declaration that asbestos-related

diseases usually have a long latency period such that such the diseases would not be expected to

develop for many years, and asbestos-related diseases usually require significant and prolonged

exposure to asbestos.  *Cf. Nguyen v. Biter*, 2015 WL 5232163, *6 (E.D. Cal. Sept. 8, 2015) (in

prisoner action complaining that drinking water contained arsenic, defendants entitled to summary

judgment on objective prong of Eighth Amendment claim because, although there was arsenic in

the local drinking water, plaintiff provided no scientific evidence that the arsenic was present in

sufficient amounts to cause the skin and other conditions he complained of, and there was no

medical evidence that his conditions were specific to arsenic exposure).

        At first blush, one might think today's determination that there is no triable issue on the

objective prong is inconsistent with the Court's finding of a triable issue on the objective prong

many months ago in the *Carter* case about the same mattress factory cleanup.  The two decisions

are not inconsistent for at least three reasons.  First, there are now color photos in the record that

literally and figuratively give a clearer picture of the situation.[5]  *See* Docket No. 50 at 17-30;

Docket Nos. 50-1, 50-2, 50-3.  The photos submitted by Mr. Arnold plainly show that any

asbestos release -- assuming (as the asbestos abatement company did) that the pipe covering had

asbestos in it -- would have been extremely limited.  The photos show an open factory

environment, high ceilings, and a limited number of pipes near those ceilings, only some of which

had any damage at all to the pipe wrapping.  The damaged areas are quite confined and spaced far

_____

[5] Photos had been submitted earlier in this case, but none were of a quality that allowed any
insight into the scope of the incident.  For example, Plaintiff submitted copies of photos of pieces
of equipment found in the factory, but those allow no insight as to what the factory or pipes looked
like.  *See* Docket No. 12 at 54-63.

United States District Court
For the Northern District of California

apart.  *See* Docket No. 50 at 17-30; Docket No. 50-1; Docket No. 50-2; Docket No. 50-3. Those photos plainly show that the situation at the mattress factory was dramatically different from the situation described in *Wallis*.  Whereas in *Wallis*, the plaintiff directly and extensively handled asbestos in a closed and dusty attic, any release of asbestos here, if any, was incidental, isolated, and occurred in a large and open factory.  Prior to submission of these color photos, the court was left guessing as to how much damage was done to an unknown number of pipes in an ill-defined environment.  The photos make clear that the situation here was for different from the asbestos blizzard in *Wallis*.  *Cf. Scott v. Harris*, 550 U.S. 372, 380-83 (2007) ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")  Second, defendants point out that an OSHA regulation sets limits on asbestos exposure and allows some small exposure to asbestos for workers.  The regulation undermines any suggestions that each and every contact with asbestos fibers presents an unacceptable danger to human health.  Since OSHA allows the free American work force to work in areas with some amount of asbestos fibers being present in the air and Congress essentially allowed children to remain in schools with asbestos being present, one cannot say that exposure of a prisoner to any amount of asbestos, no matter how small the amount, offends contemporary standards of decency.  Mr. Arnold's assertion to the contrary cannot be sustained.  Third, Defendants now present a medical expert's declaration refuting any causal connection between the claimed asbestos exposure and present ailments as well as any risk of future asbestos-related illnesses.  Mr. Arnold presents no competent evidence to the contrary.

Viewing the evidence and inferences therefrom in the light most favorable to Mr. Arnold, no reasonable jury could find that he was exposed to an unacceptably high level of asbestos.  His claim fails on the objective prong.

b.   Subjective Prong

The plaintiff must show that prison officials acted with deliberate indifference to the risk to his health or safety to establish the second prong of an Eighth Amendment claim.  Under the deliberate indifference standard, the prison official must not only "be aware of facts from which

17

United States District Court
For the Northern District of California

1   the inference could be drawn that a substantial risk of serious harm exists," but "must also draw

2   the inference." *Farmer*, 511 U.S. at 837.  The prisoner "need not show that a prison official acted

3   or failed to act believing that harm would befall an inmate; it is enough that the official acted or

4   failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.  "Whether a

5   prison official had the requisite knowledge of a substantial risk is a question of fact subject to

6   demonstration in the usual ways, including inference from circumstantial evidence, . . . and a

7   factfinder may conclude that a prison official knew of a substantial risk from the very fact that the

8   risk was obvious." *Id.* (citation omitted).

9         Mr. Earley and Mr. Loredo prevail on the subjective prong (as well as the objective prong)

10  of the Eighth Amendment claim with regard to the asbestos exposure.  Mr. Arnold has presented

11  evidence that would allow a reasonable trier of fact to determine that they were aware that there

12  was asbestos in the mattress factory.  Specifically, Mr. Arnold presented evidence that the word

13  "asbestos" was painted in red on the pipe coverings.  However, there is no evidence that Mr.

14  Earley or Mr. Loredo knew that the mattress factory cleaning work would include power washing

15  the ceiling and pipes.  There also is no evidence that the pipe coverings presumed to contain

16  asbestos presented any hazard if left undisturbed.  In light of the absence of evidence that these

17  two defendants knew that the asbestos-wrapped pipes would be power washed and thereby subject

18  to damage that allegedly released asbestos, no reasonable jury could conclude that these two

19  defendants acted with deliberate indifference to a serious risk to Mr. Arnold's health.

20        The analysis for Mr. Dobie and Mr. Young on the objective prong is different, because Mr.

21  Arnold presents evidence that they actually knew of the asbestos in the mattress factory and

22  nonetheless required inmates to work in a manner that could and did disrupt that asbestos.  Mr.

23  Arnold presents evidence that: (a) Mr. Dobie and Mr. Young were informed by inmate Beyett of

24  lead paint and asbestos in the mattress factory and specifically about the damage of power

25  washing asbestos-wrapped pipes two weeks before the work was stopped; (b) Mr. Dobie and Mr.

26  Young were aware that the power washer was being used floor to ceiling as it occurred, according

27  to Mr. Young's memorandum; (c) new employees were informed that asbestos-covered pipes were

28  located throughout the PIA complex and were instructed not to disturb those pipes; and (d) all

1    defendants knew there was at least some asbestos at San Quentin. *Cf. Wallis,* 70 F.3d at 1077 ("it

2    is not enough for the prison officials to claim they did not know about the asbestos in the attics.

3    The existence of the asbestos assessment report, the fire marshal's order to clean the debris off the

4    pipes, and the various prison officials' testimonies that they knew or suspected the existence of

5    exposed asbestos created an obligation for the defendants to inspect the attics prior to sending

6    work crews into them for forty-five hours – unprotected.")  However, there is no evidence that Mr.

7    Dobie and Mr. Young knew that the pipe covering would be severely and pervasively damaging in

8    a manner that would expose Mr. Arnold and others to an unreasonable level of exposure to

9    asbestos.  Indeed, the fact that there is no evidence of such exposure undercuts Mr. Arnold's claim

10   on the subjective prong as to these defendants.

11          In any event, even if there were a triable issue as to Mr. Dobie and Mr. Young on the

12   subjective prong given the alleged exposure warning by inmate Beyett,  Mr. Arnold must raise a

13   triable issue on *both* the subjective and the objective prongs for his Eighth Amendment claim to

14   survive summary judgment.  As discussed in the preceding section, Mr. Arnold does not show a

15   triable issue on the objective prong as to any defendant.

16          2.    <u>Lead Paint</u>

17          Mr. Arnold fails to establish, or show a genuine issue for trial, that the lead paint to which

18   he was exposed presented a sufficiently serious condition to satisfy the first prong of an Eighth

19   Amendment claim.  He presents evidence that some of the paint in the mattress factory contained

20   lead, and that he scraped and sanded paint during the mattress factory clean-up.  However, the

21   undisputed evidence is that his blood was tested for lead, and the blood test came back with a

22   *normal* result.  No evidence was presented that the amount of lead in a person's blood will

23   increase *after* the lead exposure is terminated; in other words, there is no evidence that a person

24   who has normal levels of lead in his blood after his exposure to the lead ends will later have

25   abnormally elevated levels of lead in his blood.  Given that the only objective measure of lead

26   exposure came back showing normal results, no reasonable jury could conclude that the risk posed

27   by the lead paint was "so grave that it violates contemporary standards of decency to expose

28   anyone unwillingly to such a risk."  *Helling*, 509 U.S. at 36.

The causation requirement has been treated as part of the subjective prong of the Eighth Amendment analysis by the Ninth Circuit in *Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. 2006) ("This second prong – defendant's response to the need was deliberately indifferent – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference").[6]  However, causation "also comes into play as to the objective component" of a claim based on exposure to a toxic substance because the objective prong "allows a court to consider, among other things, a 'scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [a substance].'"  *Moore v. Faurquire*, 595 F. App'x 968, 973 n.6 (11th Cir. 2014).  For example, in *Moore*, the court found that a prisoner failed to raise a triable issue on the objective prong because he presented no evidence that applying paint stripper while wearing inadequate protective gear for one week created a substantial risk of serious harm: his "medical records contain no evidence that such a limited exposure to the paint stripper was capable of causing" the health problems he attributed to the exposure.  *Id.* at 973.  *See, e.g., Maus v. Murphy*, 29 F. App'x 365, 369 (7th Cir. 2002) (plaintiff "cannot prevail by demonstrating that the cell-front construction merely exposed him to a risk of harm; instead he must show that the project actually caused him harm or was reasonably certain to cause him future serious injury," but plaintiff had failed to "present evidence connecting lung complications to any risks associate with exposure to lead paint"); *Mejia v. McCann*, 2010 WL 5149273, *8-*9 (N. D. Ill. 2010) ("existence of lead paint on walls does not state a viable constitutional claim," and there was no "competent evidence that lead paint in his cellhouse has caused [plaintiff] injury").

Mr. Arnold fails to show a triable issue in support of his Eighth Amendment claim.

There *is* a test for lead exposure, and Mr. Arnold had a normal test result.  A reasonable jury could not ignore that the blood test showed no harm to Mr. Arnold when deciding whether

---

[6] If there is an ongoing risk, the prisoner need not await until harm is caused to him before obtaining injunctive relief.  *See Farmer*, 511 U.S. at 845.  Here, there is not an ongoing problem from which the plaintiff seeks injunctive relief, but instead a past problem for which he seeks damages.  Mr. Arnold does not present any evidence showing any ongoing danger at the factory following the lead paint and asbestos abatement work that was done after the factory was closed on June 6.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Mr. Arnold had raised a triable issue on the objective prong of his Eighth Amendment claim.

2  Given the limited duration of his exposure to lead and the normal blood test results, a reasonable

3  jury could not find that he was exposed to a risk "so grave that it violates contemporary standards

4  of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36.  Mr. Arnold has

5  not shown any expertise in the diagnosis of medical conditions and any claimed causal link

6  between the lead exposure and any ailment he has is pure speculation in view of the normal blood

7  test results.  *See, e.g.*, *Mejia v. McCann*, 2010 WL 5149273, *9-*10 (summary judgment granted

8  for defendants on Eighth Amendment claim based on the regional problem of radium in the water

9  because plaintiff did not show it caused plaintiff any harm, and his allegations that he suffered dry

10  scalp and hair loss that he did not have before incarceration was not sufficient to send the matter to

11  trial).  Mr. Arnold's claim falters on the objective prong of his Eighth Amendment claim for lead

12  exposure.

13      Mr. Arnold's lead exposure claim also fails on the subjective prong.  As to Mr. Earley and

14  Mr. Loredo, viewing the evidence in the light most favorable to Mr. Arnold, no reasonable jury

15  could find that those defendants were deliberately indifferent to any risk posed by lead paint.  Mr.

16  Arnold presents no competent evidence that Mr. Earley or Mr. Loredo was aware that there was

17  lead paint in the factory or that either was aware that the inmates would be scraping lead paint in

18  the factory cleaning operations.  The undisputed evidence is that these two defendants did not

19  know of the lead paint, and without an awareness of the risk, they cannot be said to have been

20  deliberately indifferent to any risk posed by it.  The lead paint claim would not fail on the

21  subjective prong as to Mr. Dobie and Mr. Young because Mr. Arnold presented evidence they

22  were informed by Mr. Beyett of the presence of lead paint.  Finally, if as *Jett* suggests, causation is

23  part of the subjective prong of the Eighth Amendment analysis, Mr. Arnold's claim fails against

24  all Defendants because there is a complete absence of evidence that their actions or inactions with

25  regard to the lead paint caused him any harm or risk of future injury.

26      In order to avoid summary judgment, Mr. Arnold had to establish or show a triable issue of

27  fact as to the existence of both prongs of his Eighth Amendment claims.  Viewing the evidence

28  and reasonable inferences therefrom in the light most favorable to Mr. Arnold, all Defendants are

1    entitled to judgment in their favor on his Eighth Amendment claim based on his alleged exposure

2    to asbestos and lead.

3    B.    Qualified Immunity

4          The defense of qualified immunity protects "government officials . . . from liability for

5    civil damages insofar as their conduct does not violate clearly established statutory or

6    constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457

7    U.S. 800, 818 (1982).  In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-

8    pronged test to determine whether qualified immunity exists.  First, the court asks:  "Taken in the

9    light most favorable to the party asserting the injury, do the facts alleged show the officer's

10   conduct violated a constitutional right?"  *Id.* at 201.  If no constitutional right was violated if the

11   facts were as alleged, the inquiry ends and defendants prevail.  *See id.*  If, however, "a violation

12   could be made out on a favorable view of the parties' submissions, the next, sequential step is to

13   ask whether the right was clearly established. . . .  'The contours of the right must be sufficiently

14   clear that a reasonable official would understand that what he is doing violates that right.' . . . The

15   relevant, dispositive inquiry in determining whether a right is clearly established is whether it

16   would be clear to a reasonable officer that his conduct was unlawful in the situation he

17   confronted."  *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although

18   *Saucier* required courts to address the questions in the particular sequence set out above, courts

19   now have the discretion to decide which prong to address first, in light of the particular

20   circumstances of each case.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

21         The existence of a triable issue as to whether a prison official was deliberately indifferent

22   to an inmate's health or safety may require denial of a defense motion for summary judgment on

23   the merits of the Eighth Amendment claim, but the qualified immunity analysis does not end there.

24   *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002); *see id.* at 1049

25   ("*Saucier's* key point is that the qualified immunity inquiry is separate from the constitutional

26   inquiry").  "Even though the constitutional issue turns on the officers' state of mind (here,

27   deliberate indifference to a substantial risk of serious harm), courts must still consider whether –

28   assuming the facts in the injured party's favor – it would be clear to a reasonable officer that his

United States District Court
For the Northern District of California

conduct was unlawful." *Estate of Ford*, 301 F.3d at 1045.  That is, the court must consider whether the information available to the defendants made it so clear that the plaintiff would be harmed that no reasonable officer could have allowed the situation to occur.  *Id.*

For an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must *subjectively* have a sufficiently culpable state of mind, i.e., "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' . . .  Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high.  In these circumstances, he would be entitled to qualified immunity."  *Estate of Ford*, 301 F.3d at 1050 (quoting *Farmer v. Brennan*, 511 U.S. at 834, and citing *Saucier*, 533 U.S. at 205).  Although the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3).  Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm.  *Farmer* left that an open issue. This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Estate of Ford*, 301 F.3d at 1051 (emphasis in original).  Each of the defendants in *Ford* was entitled to qualified immunity even though he was aware of some information that there was *some* risk in double-celling the violent inmate with the decedent or any other inmate.

Just as qualified immunity was allowed in *Estate of Ford* because of the undefined qualitative elements, qualified immunity is appropriate here because of the undefined qualitative elements in *Helling*.  *Cf. A.D. v. California Highway Patrol*, 712 F.3d 446, 455 n.4 (9th Cir. 2013) (denying qualified immunity for a substantive due process claim; "[t]he standard for a due process violation – purpose to harm unrelated to a legitimate law enforcement objective – does not contain undefined qualitative elements ("substantial risk" and "serious harm") like the Eighth Amendment

United States District Court

For the Northern District of California

23

1   standard does.").  *Helling* stated that whether exposure to "unreasonably high levels" of a toxic

2   substance violates the Eighth Amendment "requires more than a scientific and statistical inquiry

3   into the seriousness of the potential harm and the likelihood that such injury to health will actually

4   be caused by exposure to [the toxic substance].  It also requires a court to assess whether society

5   considers the risk that the prisoner complains of to be so grave that it violates contemporary

6   standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner

7   must show that the risk of which he complains is not one that today's society chooses to tolerate."

8   *Helling*, 509 U.S. at 36.  This imprecise rule is the sort of rule that lower courts sometimes have to

9   struggle with to determine its application to a given set of circumstances.

10        The cases mentioned earlier show that not all exposure to asbestos amounts to an

11   objectively serious conduct, and that no court has articulated a well-defined test that a reasonable

12   prison official could look to in order to determine the lawfulness of his actions.  On the one hand,

13   *Wallis* found an Eighth Amendment violation for an inmate who directly handled already-

14   damaged asbestos containing materials in a confined space for about 45 hours.  On the other hand,

15   courts have rejected claims of Eighth Amendment violations from an inmate who worked for

16   about an hour removing asbestos mastic and tiles (*Templeton v. Anderson)*, an inmate who was

17   exposed to asbestos dust for a few hours (*Smith v. Howell*), and an inmate who was housed for ten

18   months near asbestos-covered (but undisturbed) pipes (*McNeil v. Lane*).  The fact that lower courts

19   have reached different results in determining whether exposure to a given toxic substance is an

20   unreasonably high level so as to amount to an objectively sufficient serious condition highlights

21   the difficulty that a reasonable prison official would have in determining whether his conduct was

22   unlawful when inmates are exposed to or work with toxic substances.  The same problem exists

23   for lead paint – no court has articulated a well-defined test that a reasonable official could look to

24   in order to determine the lawfulness of his actions in allowing prisoners to deal with lead paint.

25        Defendants are entitled to qualified immunity against Mr. Arnold's claims that they were

26   deliberately indifferent based on the asbestos and lead exposure because, as discussed above, the

27   facts in the record do not show the violation of a constitutional right by them.  *See Saucier*, 533

28   U.S. at 201 (defendants prevail on qualified immunity if there was no constitutional violation).

1   The undefined contours as to what amounts to "unreasonably high levels," *Helling*, 509 U.S. at 35,

2   of a toxic substance (such as asbestos or lead) to satisfy the objective prong of an Eighth

3   Amendment analysis also provides a second and independent basis for qualified immunity as to

4   Mr. Arnold's claims.  Under the facts of this case, given the minimal, if any, exposure to lead and

5   asbestos in the mattress facility, the defendants could have believed reasonably and mistakenly

6   that the risk was not sufficiently substantial to violate the Eighth Amendment.  This is not a case

7   like *Wallis*, where there was prolonged and intense exposure to friable asbestos.

8   C.      State Law Claims

9         Mr. Arnold contends that Mr. Earley and Mr. Loredo "attempted to minimize the severity

10  of the exposure by failing to disclose/enter onto the Workers' Compensation forms exposure to

11  Asbestos."  Docket No. 12 at 4.  Mr. Arnold believed at the relevant time that he had been exposed

12  to asbestos, yet he indisputably did not attempt to file a second workers' compensation claim to

13  add asbestos exposure to the list of alleged workplace injuries he suffered during the relevant time.

14        Defendants persuasively argue that any state law claims Mr. Arnold is attempting to allege

15  in his amended complaint must be dismissed.  First, the workers' compensation scheme in

16  California Labor Code sections 3370 and 3601 is the exclusive remedy for injuries arising out of

17  the course and scope of employment.  *See* Cal. Lab. Code §§ 3600, 3602; *Cole v. Fair Oaks Fire*

18  *Protection Dist.*, 43 Cal. 3d 148, 155-57 (Cal. 1987); *see also Jimeno v. Mobil Oil Corp.*, 66 F.3d

19  1514, 1530 (9th Cir. 1995) ("we find that the California workers' compensation provisions

20  provide the exclusive remedy under California law for a work-related physical disability

21  discrimination claim").  The exclusive remedy provided by the California workers' compensation

22  scheme also precludes an action against another employee except in two circumstances not alleged

23  to be present here, i.e., intoxication or a "willful and unprovoked physical act of aggression of the

24  other employee."  Cal. Lab. Code § 3601(a)(1).

25        Second, insofar as Mr. Arnold is alleging a claim of intentional concealment or fraud in the

26  preparation of the worker's compensation claim form that might not fall within the exclusive

27  remedy of the worker's compensation scheme, such a claim must be dismissed because Mr.

28  Arnold indisputably failed to comply with the California Government Claims Act, which requires

United States District Court
For the Northern District of California

25

presentation of the claim to the California Victim Compensation and Government Claims Board ("Board").  *See* Cal. Gov't Code §§ 905.2, 911.2, 945.4, 950.2.  Mr. Arnold had to present his personal injury tort claim against a state employee or entity to the Board within six months of the accrual of the cause of action, and had to present any claim relating to any other cause of action within a year after the accrual of the cause of action.  *See* Cal. Gov't Code § 911.2.  Timely claim presentation is "a condition precedent to plaintiff's maintaining an action against [a state employee or entity] defendant."  *California v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1240 (Cal. 2004).  Mr. Arnold did not allege that he presented a claim to the Board and presents no evidence that he actually presented such a claim.  Therefore, any state law claim that is not barred by the rule that the workers' compensation scheme is the exclusive remedy is dismissed because Mr. Arnold did not comply with the claim presentation requirement of the California Government Claims Act.  The state law claims are dismissed.

## VI.    CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Jeremy Young is **GRANTED**, and the motion for summary judgment filed by Joe Dobie, Phillip Earley and Gary Loredo is **GRANTED**.  (Docket Nos. 57, 58.)  The Clerk shall close the file.


**IT IS SO ORDERED**.


Dated: December 2, 2016

_____
EDWARD M. CHEN
United States District Judge